Slip Op. 07-180

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

MAXCELL BIOSCIENCE, INC.,                        :

                                   *Plaintiff*,          :

                         v.                      :          Court No. 04-00254

UNITED STATES,                                   :

                                  *Defendant*.           :
_____

[Plaintiff's motion for summary judgment is denied; Defendant's cross-motion is granted.]

                                        Dated:  December 18, 2007

        Peter S. Herrick, P.A. (Peter S. Herrick), for Plaintiff.

        Jeffrey S. Bucholtz, Acting Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Edward F. Kenny); Su-Jin Yoo, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.


                              **OPINION**

RIDGWAY, Judge:

        At issue in this action is the tariff classification of MetaBerry and Aloe Gold, two liquid "dietary supplements" imported from Korea by plaintiff MaxCell BioSciences, Inc. in 2002 and 2003.

The Bureau of Customs and Border Protection[1] liquidated the subject entries of the two products under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States ("HTSUS").[2]  That subheading covers "[f]ood preparations not elsewhere specified or included," which are dutiable at the rate of 6.4% *ad valorem*.  MaxCell claims that the merchandise is instead classifiable as "other nonalcoholic beverages" under subheading 2202.90.90, subject to duties at the rate of 0.2¢ per liter.

Cross-motions for summary judgment are pending.  *See generally* Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment ("Pl.'s Brief"); Plaintiff's Memorandum of Law in Opposition to Defendant's Cross Motion for Summary Judgment ("Pl.'s Reply Brief"); Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Brief"); Defendant's Reply Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply Brief").

Jurisdiction lies under 28 U.S.C. § 1581(a) (2000).[3]  Customs' classification decisions are

---

[1]The U.S. Customs Service – formerly part of the U.S. Department of the Treasury – is now part of the U.S. Department of Homeland Security, and is known as U.S. Customs and Border Protection.  The agency is referred to as "Customs" herein.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308; 72 Fed. Reg. 20,131 (April 23, 2007).

[2]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("ARIs"), sections I through XXII (chapters 1 to 99, including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto), and the Chemical Appendix.  *See*, *e.g.*, BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007) (citations omitted).  Except as otherwise noted, all citations herein are to the 2002 version of the HTSUS.

[3]Except as otherwise noted, all statutory citations (other than citations to the HTSUS) are to the 2000 edition of the United States Code.

subject to *de novo* review pursuant to 28 U.S.C. § 2640.

For the reasons set forth below, MetaBerry and Aloe Gold are properly classified as "[f]ood

preparations not elsewhere specified or included," under subheading 2106.90.99 of the HTSUS.

MaxCell's motion for summary judgment is therefore denied, and the Government's cross-motion

is granted.[4]

## I.  The Merchandise at Issue

The two products at issue in this matter – MetaBerry and Aloe Gold – are liquid "dietary

supplements," sold in wide-mouth, 32 fluid ounce plastic containers.[5]  The labels on both products

indicate that there are 32 servings per container.  And the instructions for suggested use indicate that

MetaBerry and Aloe Gold are to be taken in measured, one- to two-ounce doses before each meal,

"or as needed."  To that end, the cone-shaped cap that tops each of the products is designed to serve

as a measuring cup, with lines marked on the interior of the cap to indicate specific dosages

---

[4]MaxCell's Complaint actually included six counts – one count challenging Customs' classification of MaxCell's merchandise, followed by five counts alleging that certain entries had not been timely liquidated by Customs and therefore were required to be liquidated under MaxCell's proposed classification.  *See* Complaint.  However, as MaxCell now acknowledges, all liquidations (and re-liquidations) of the merchandise at issue here were, in fact, timely.  *See* Def.'s Brief at 23-24; Pl.'s Reply Brief at 9-10.  MaxCell has therefore conceded that the last five counts of its Complaint – Counts II through VI (misnumbered Counts II through V) – should be dismissed.

[5]All facts herein are uncontested, and – except as otherwise indicated – are drawn from Plaintiff's Statement of Material Facts Which Are Not In Dispute and Defendant's Response thereto, from Defendant's Additional Statement of Undisputed Material Facts, and from the samples of the merchandise at issue (which the Government supplied with its cross-motion).

Because MaxCell did not respond to Defendant's Additional Statement of Undisputed Material Facts, the statements therein are deemed admitted.  *See* USCIT Rule 56(h)(3).

(including one and two ounces).[6]

Maxcell markets MetaBerry as a substance which optimizes oxygen and glucose delivery to the brain, protects the body from free radicals, enhances the immune system, and fosters cardiovascular and urinary tract health. The label on the container prominently touts MetaBerry as an "ANTI-CATABOLIC," a "Dietary Supplement," and a "Mind Body Formula & High Potency Antioxidant."[7] Similarly, Aloe Gold is marketed as a substance which slows the aging process by decreasing catabolic activity through increased antioxidant activity, and which restores the body's ideal pH, restores water balance in the colon, and supports the natural healing and renewing mechanisms of the gastrointestinal tract. Like MetaBerry, Aloe Gold is also labeled as an "ANTI-CATABOLIC" and a "Dietary Supplement."

According to the list of ingredients on the label, MetaBerry is a preparation based on a "Fruit Blend (concentrate)" of blueberry, cranberry, cherry, and grape, together with aloe vera, ginkgo biloba, alpha lipoic acid, as well as a proprietary herbal blend of jujube extract, black pepper, active aloe, and Chinese licorice, plus preservatives.[8] The product has a somewhat bitter, medicinal taste.

---

[6]According to a declaration submitted by Customs' National Import Specialist responsible for the classification of dietary supplements, MetaBerry and Aloe Gold are also sold in one-ounce foil pouches.

[7]The label further states that "MetaBerry is a unique combination of berry concentrates and botanicals which contain powerful antioxidants to help protect your brain and body. Among its many benefits, MetaBerry promotes: • Improved cerebral circulation • Healthy blood sugar balance • Healthy cholesterol in individuals with already normal levels • Urinary Tract Health • Healthy Liver Function • Healthy gums."

[8]According to MaxCell, MetaBerry falls within the definition of a "dietary supplement" set forth in 21 U.S.C. § 321(ff), and is labeled as such in compliance with Food and Drug Administration ("FDA") regulations. *See* 21 C.F.R. § 101.36 (2003); Pl.'s Brief at 5; Pl.'s Statement of Material Facts ¶ 5. *But see* Def.'s Response to Pl.'s Statement of Material Facts ¶ 5 (denying "for

And a warning on the label cautions against use by pregnant or nursing women without consulting a physician.

The list of ingredients on the Aloe Gold label indicates that it is a preparation consisting of active aloe, carragel,[9] pine needle extract, citric acid, and green tea extract, as well as the same proprietary herbal blend and preservatives that MetaBerry contains.[10]  Aloe Gold has an oily appearance, and a texture or consistency similar to that of cod liver oil.  And, like MetaBerry, Aloe Gold too is labeled to warn against its use by pregnant or nursing women without consulting a physician.

MetaBerry and Aloe Gold are sold through two main channels.  Both products are offered for sale though the website of MaxCell's distributor, Oasis LifeSciences, alongside other products advertised as "part of a healthy and nutritious lifestyle which brings back the hope and vitality of youth."  In addition, the two products are available for purchase through agents known as "independent Associates," who host "Ageless Living" events in their homes to promote Metaberry and AloeGold, along with other Oasis LifeSciences products.  A 32 fluid ounce container of MetaBerry costs approximately $38.25, while a container of Aloe Gold sells for approximately

---

lack of knowledge or information sufficient to form a belief as to the truthfulness of plaintiff's claim").

[9]The declaration that MaxCell submitted in support of its motion explains that carragel is "water soluble gum extracted from seaweed," which is used as a "thickening agent."

[10]MaxCell states that Aloe Gold also falls within the definition of a "dietary supplement" set forth in 21 U.S.C. § 321(ff), and is so labeled in accordance with Food and Drug Administration ("FDA") regulations.  *See* Pl.'s Brief at 5; Pl.'s Statement of Material Facts ¶ 13.  *But see* Def.'s Response to Pl.'s Statement of Material Facts ¶ 13 (denying "for lack of knowledge or information sufficient to form a belief as to the truthfulness of plaintiff's claim").

$25.95 – roughly $1.20 per ounce and $0.80 per ounce, respectively.

Customs' position concerning the classification of MetaBerry and Aloe Gold is set forth in

Headquarters ruling letters HQ 966849 and HQ 966850, respectively.  *See* HQ 966849 (April 26,

2004); HQ 966850 (April 27, 2004).[11]

## II.  <u>Standard of Review</u>

Pursuant to USCIT Rule 56, summary judgment is appropriate where "there is no genuine

issue as to any material fact and . . . the moving party is entitled to . . . judgment as a matter of law."

USCIT R. 56(c).

Customs' classification determinations are reviewed through a two-step process.  First, the

relevant tariff headings must be construed, which is a question of law.  And, second, a determination

must be made as to the tariff term under which the merchandise at issue falls, which is a question

of fact.  <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1364-65 (Fed. Cir. 1998) (citation

omitted).  Thus, in customs classification cases, "summary judgment is appropriate when there is

no genuine dispute as to the underlying factual issue of exactly what the merchandise is."  <u>Bausch</u>

<u>& Lomb</u>, 148 F.3d at 1365 (citations omitted).

Here, although the parties argue for classification under different headings of the HTSUS,

there are no genuine disputes of material fact.  The parties are in agreement as to "exactly what the

merchandise is" – "dietary supplements" in liquid form, to be taken in measured, one- to two-ounce

---

[11]HQ 966849 actually granted MaxCell's protest as to the entry of MetaBerry there at issue, because – as the ruling letter explains – Customs' reliquidation of the subject merchandise under heading 2106 was untimely.  HQ 966849 nevertheless reflects Customs' position on the merits of the proper classification of the product.  *See* Def.'s Brief at 3 n.1.

doses three times a day (before meals), to help maintain general health and well-being. This matter

is therefore ripe for summary judgment.

## III. <u>Analysis</u>

Merchandise imported into the United States is classified for tariff purposes under the

provisions of the HTSUS. Classification of merchandise under the HTSUS is governed by the

principles set forth in the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules

of Interpretation ("ARIs"). *See*, *e.g.*, <u>North Am. Processing Co. v. United States</u>, 236 F.3d 695, 698

(Fed. Cir. 2001). Because both the GRIs and the ARIs are part of the HTSUS, they are considered

statutory law for all purposes. *See* 19 U.S.C. § 1202.

The GRIs are applied in sequential order. Most merchandise is classified pursuant to GRI

1, which provides that "classification shall be determined according to the terms of the headings and

any relevant section or chapter notes and, provided such section or chapter notes do not otherwise

require, according to [GRIs 2 through 6]." Here, both Maxcell and the Government contend that the

merchandise is classifiable pursuant to GRI 1 – albeit with very different results. Maxcell claims

that application of GRI 1 leads to classification as a "nonalcoholic beverage" under heading 2202,

while the Government maintains that it leads to classification as a "food preparation" under heading

2106. *See*, *e.g.*, Pl.'s Brief at 4; Def.'s Brief at 20-21; Def.'s Reply Brief at 7 n.2.[12]

---

[12]At several points in its briefs, MaxCell asserts unequivocally that MetaBerry and Aloe Gold cannot be classified under heading 2106. *See* Pl.'s Brief at 4; Pl.'s Reply Brief at 8. However, in its Reply Brief, MaxCell also argues – apparently in the alternative, though that is far from clear – that MetaBerry and Aloe Gold are *prima facie* classifiable under *both* heading 2202 and heading 2106. *See* Pl.'s Reply Brief at 4. According to MaxCell, classification under heading 2202 is nevertheless compelled, because GRI 3(a) provides that, when merchandise is *prima facie* classifiable under two or more headings, it should be classified under the heading that provides the

A. <u>HTSUS Heading 2202</u>

MaxCell contends that MetaBerry and Aloe Gold are properly classifiable as "other nonalcoholic beverages" under heading 2202 of the HTSUS. Heading 2202 covers "[w]aters, including mineral waters and aerated waters, containing added sugar or other sweetening matter or flavored and *other nonalcoholic beverages*, not including fruit or vegetable juices of heading 2009." *See* Heading 2202, HTSUS (emphasis added).[13]

MaxCell argues that, "[f]or tariff purposes, a beverage is a product which is drinkable in its condition as imported." *See* Pl.'s Brief at 4. According to MaxCell, because "MetaBerry and Aloe Gold are drinkable in their condition as imported," they are classifiable under heading 2202. *Id.*; *see also* Pl.'s Reply Brief at 6 (claiming that "[s]ince Metaberry and Aloe Gold are drinkable liquids with no alcoholic content they are 'other nonalcoholic beverages' within the terms of HTSUS heading 2202"). MaxCell's argument boils down to the bald assertion that all nonalcoholic liquids

---

most specific description. *See* Pl.'s Reply Brief at 4-5; GRI 3(a), HTSUS. MaxCell further contends that, even if heading 2106 and heading 2202 were equally specific, GRI 3(c) would require classification under heading 2202, because it is the heading that occurs last in numerical order. *See* Pl.'s Reply Brief at 5-6; GRI 3(c), HTSUS.

As explained below, however, MetaBerry and Aloe Gold are not *prima facie* classifiable under heading 2202. Resort to GRI 3 is therefore improper.

GRI 2(a) and 2(b) – which have no bearing here – generally deal, respectively, with the classification of articles that are "incomplete," "unfinished," "unassembled," or "disassembled," and with the classification of "mixtures or combinations" of materials or substances.

[13]Specifically, MaxCell contends that MetaBerry and Aloe Gold should be classified under subheading 2202.90.90 of the HTSUS, which covers "[w]aters, including mineral waters and aerated waters, containing added sugar or other sweetening matter or flavored, and other nonalcoholic beverages, not including fruit or vegetable juices of heading 2009: Other: Fruit or vegetable juices, fortified with vitamins or minerals: Other: Other."

which can be consumed by humans are "beverages" classifiable under heading 2202. But that claim withers swiftly under scrutiny.

In an effort to support its assertion that "a beverage is a product which is drinkable in its condition as imported," MaxCell reaches back almost 70 years to Strohmeyer, a case involving the classification of nonalcoholic creme de menthe and creme de cacao. *See* Pl.'s Brief at 4 (*citing* Strohmeyer & Arpe v. United States, 28 C.C.P.A. 34 (1940)); *see also* Pl.'s Reply Brief at 9. Strohmeyer construed a tariff provision covering nonalcoholic beverages which appeared in a 1930 version of the Tariff Schedule of the United States ("TSUS"), an early predecessor of the current HTSUS applicable in this action.[14]

As the Government correctly points out, however, the fact that the creme de menthe and creme de cacao in Strohmeyer were drinkable in their condition as imported was merely the initial, *threshold* showing required to justify their classification as beverages. *See generally* Def.'s Brief at 13-14. Contrary to MaxCell's implication, nothing in Strohmeyer suggests that *all* liquids that can be consumed by humans are "beverages" for tariff purposes. Instead, expressly relying on a definition of "beverage" from Webster's New International Dictionary – "Liquid for drinking; drink; usually, drink artificially prepared and *of an agreeable flavor*; as, an intoxicating *beverage*" – the Strohmeyer court based its decision largely on the testimony of a witness who had "served those preparations frequently in his own home" and who testified that "they were *very refreshing* drinks."

---

[14]The language of the TSUS provision at issue in Strohmeyer and the language of heading 2202 of the HTSUS are quite different. But, even where the language of the provisions of the TSUS and the HTSUS are identical, decisions interpreting the TSUS may be instructive, but they are not dispositive. *See*, *e.g.*, JVC Co. of America v. United States, 234 F.3d 1348, 1354-55 (Fed. Cir. 2001) (citations omitted).

Strohmeyer, 28 C.C.P.A. at 38-39 ("beverage" emphasized in the original; other emphases added).

Strohmeyer thus does nothing to support MaxCell's position.  If anything, Strohmeyer militates

*against* classification under heading 2202.

The HTSUS defines "nonalcoholic beverages" as "beverages of an alcoholic strength by

volume not exceeding 0.5 percent vol." *See* Note 3 to Chapter 22, HTSUS.  However, the HTSUS

does not define the term "beverage" itself.  If a tariff term is not statutorily defined, a court may rely

on its own understanding of the term, on standard lexicographic authorities, and on the relevant

Explanatory Notes.  Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994)

(citations omitted).

The Explanatory Notes are the official interpretation of the scope of the Harmonized

Commodity Description and Coding System (on which the HTSUS is based), as set forth by the

Customs Cooperation Council (the international organization now known as the World Customs

Organization), which drafted the international nomenclature.  Accordingly, while the Explanatory

Notes "do not constitute controlling legislative history," they are "generally indicative of proper

interpretation of the [HTSUS]."  Mita Copystar, 21 F.3d at 1082; Warner-Lambert Co. v. United

States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (quotation omitted); H.R. Conf. Rep. No. 576, 100th

Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.[15]

Although the Explanatory Notes accompanying heading 2202 do not expressly define

---

[15]As Congress has recognized, the Explanatory Notes "provide a commentary on the scope
of each heading of the Harmonized System and are thus useful in ascertaining the classification of
merchandise under the system." Id.; *see also* 54 Fed. Reg. 35,127, 35,128 (Aug. 23, 1989) (although
the Explanatory Notes are not dispositive or legally binding, they provide a commentary on the
scope of each heading of the HTSUS, and are the official interpretation of the Harmonized System
at the international level).

"beverage," they define the scope of the heading, using illustrative examples which are instructive

here. According to the Explanatory Notes to heading 2202, that heading covers:

> (A)     Waters, including mineral waters, containing added sugar or other sweetening matter or flavored.
>
> This group includes, *inter alia*:
>
> > (1)     Sweetened or flavored mineral waters (natural or artificial).
> >
> > (2)     Beverages such as lemonade, orangeade, cola, consisting of ordinary drinking water, sweetened or not, flavored with fruit juices or essences, or compound extracts, to which citric acid or tartaric acid are sometimes added. They are often aerated with carbon dioxide gas, and are generally presented in bottles or other airtight containers.
>
> (B)     Other non-alcoholic beverages, not including fruit or vegetable juices or heading 20.09.
>
> This group includes, *inter alia*:
>
> > (1)     Tamarind nectar rendered ready for consumption as a beverage by the addition of water and sugar and straining.
> >
> > (2)     Certain other beverages ready for consumption, such as those with a basis of milk and cocoa.

Explanatory Notes, Heading 2202, HTSUS.[16] Notably, all the "beverages" specifically identified

in the Explanatory Notes to heading 2202 – including lemonade, orangeade, cola, and "beverages

ready for consumption . . . with a basis of milk and cocoa" – are flavorful, refreshing drinks.[17]

---

[16]Except as otherwise noted, all citations herein are to the 2002 version of the Explanatory Notes.

[17]Heading 2202 and the Explanatory Notes that accompany it are properly construed *in pari materia* with other headings of the HTSUS, including heading 2106 and its Explanatory Notes. As detailed below, the Explanatory Notes to heading 2106 document the drafters' express intent that supplements such as MetaBerry and Aloe Gold – which are based on plant extracts, fruit concentrates, and the like, and which are marketed as products designed to foster general health and

Equally instructive is what the Explanatory Notes to heading 2202 expressly exclude from classification under that heading. The Explanatory Notes emphasize, for example, that "[t]his heading *does not include* . . . [f]ruit or vegetable juices, whether or not used as beverages." Explanatory Notes, Heading 2202, HTSUS. That statement alone suffices to refute MaxCell's claim that all nonalcoholic liquids that can be consumed by humans are beverages classifiable under heading 2202.

In its classification determinations, Customs has consistently interpreted "beverage" for tariff purposes in accordance with the Explanatory Notes and the common meaning of that term, as discussed above. In the ruling letters at issue in this case and in numerous other such rulings, Customs has explained:

> [B]everages, as the term is contemplated by [heading 2202], consist of drinkable liquid substances which are marketed, sold, or distributed in multi-ounce containers (*e.g.*, bottles) for consumption in significant (*e.g.*, multi-ounce) and non-measured (*e.g.*, not marketed, sold, or distributed in dosage form or in vials) quantities, and not necessarily consumed for strictly health or nutritional purposes (*e.g.*, colas). Accordingly, food preparations in liquid form, containing, among other things, honey and royal jelly (in whatever proportional amounts), marketed, sold, or distributed in vials or other like containers for consumption in small, measured, or dosage-form quantities, and taken for nutritional or health purposes, would, most certainly, not be classified as "beverages" under heading 2202 of the HTSUSA.

HQ 084981 (June 19, 1990) (classifying "nutritional food preparations" containing honey and royal jelly, as well as plant- or animal-based extracts, under heading 2106); *see also*, *e.g.*, HQ 966849 (same) (classifying MetaBerry); HQ 966850 (same) (classifying Aloe Gold); HQ 086744 (June 19, 1990) (same, except referring to "ginseng," in addition to "honey" and "royal jelly") (classifying "nutritional health supplement" containing honey, royal jelly, and ginseng, as well as plant- or

---

well-being – are to be classified under heading 2106. *See* section III.B, *infra*.

animal-based extracts, under heading 2106). *Cf.* HQ 961909 (March 29, 1999) ("[l]iquid vitamin products intended to supplement one's dietary or nutritional needs are not properly classified under Heading 2202"; children's liquid vitamins classified under heading 2106).

MaxCell seeks to rely on HQ 956858 and HQ 960544, in which Customs classified as a beverage under heading 2202 a high protein drink sold in eight ounce cans and marketed as "Boost Nutritional Energy Drink." *See* Pl.'s Brief at 5; HQ 956858 (Jan. 23, 1995); HQ 960544 (April 10, 1998). MaxCell emphasizes Customs' observation that "Boost is not intended to be a regular diet or ingested in lieu of meals." *See* Pl.'s Brief at 5 (*quoting* HQ 956858). MaxCell argues that MetaBerry and Aloe Gold similarly "are not intended to be a regular diet or ingested in lieu of meals," and thus should be classified under heading 2202 as well.

MaxCell's argument fundamentally misrepresents the basis for Customs' classification of Boost, however. Contrary to MaxCell's implication, Customs' determination did not turn on whether or not the product was nutritionally complete. Instead, Customs pointed to the fact that "BOOST is advertised as a refreshing drink," and the fact that Boost is "available in 'four delicious flavors'" – "chocolate, mocha (coffee), vanilla, and strawberry." *See* HQ 960544.[18] In stark

---

[18]Further, Customs distinguished Boost from Sustacal, which Customs had previously classified under heading 2106. Customs observed that, "rather than emphasizing the function of the merchandise as 'a refreshing drink'" – Sustacal's label "describes the merchandise as a 'nutritionally complete liquid food,' and does not even refer to the taste or 'refreshing' nature of the merchandise." *See* HQ 960544.

Similarly, in HQ 088377, Customs classified as a beverage under heading 2202 Lipovitan, a vitamin supplement or tonic that was "marketed as a refreshing drink." *See* HQ 088377 (May 4, 1992). Customs noted that – in light of its "high vitamin content and its alleged healthful purpose" – Lipovitan had previously been classified under heading 2106, because heading 2202 has an "emphasis on soft drinks, such as cola, lemonade, nectars and purees with added water and sugar," and "concern[s] products primarily consumed for pleasure, in unlimited quantities." *Id.* However,

contrast, neither MetaBerry nor Aloe Gold is designed or marketed as a flavorful or refreshing drink. HQ 956858 and HQ 960544 thus support the position of the Government, not that of MaxCell.

The MaxCell merchandise at issue in this action – MetaBerry and Aloe Gold – does not fall within the common meaning of the term "beverage" as that term is used in heading 2202 of the HTSUS. Unlike beverages such as lemonade, orangeade, or cola or other soft drinks, neither MetaBerry nor Aloe Gold is intended for "consumption in significant (*e.g.*, multi-ounce) and non-measured . . . quantities." Instead, the recommend dosage for both is a mere one to two ounces, taken three times a day, before meals. Further, it is undisputed that MetaBerry has a rather bitter, medicinal taste, and that Aloe Gold has an oily appearance and the texture or consistency of cod liver oil. Thus, it cannot be said that either product is designed to be flavorful and refreshing, or to quench thirst. Indeed, both products are specifically labeled and marketed as "dietary supplements." The record is devoid of evidence that anyone would buy or consume either one other than "for strictly health or nutritional purposes." Finally, nonalcoholic beverages typically do not carry warning labels cautioning against use by pregnant or nursing women without consulting a physician. Accordingly, neither MetaBerry nor Aloe Gold is a "beverage" classifiable under heading 2202 of the HTSUS.

The result is no different if heading 2202 is treated as a "use" provision, rather than an *eo*

---

after further consideration, Customs concluded that, "[w]hile [Lipovitan] may be designed to replenish the imbiber's vitamin supply, it is also intended to be the 'pause that refreshes,' a primary function of a beverage. All in all the main purpose of [Lipovitan] is no different than that of many other chilled, sweetened beverages: to slake one's thirst after arduous activity." *Id.*

*nomine* provision.  *See generally* Def.'s Brief at 15-19.[19]

The Government observes that <u>Strohmeyer</u> cited Webster's New International Dictionary, which defined "beverage" as a "[l]iquid for drinking; drink; usually, drink artificially prepared and *of an agreeable flavor*; as, an intoxicating *beverage*."  *See* Def.'s Brief at 15 (*citing* <u>Strohmeyer</u>, 28 C.C.P.A. at 38 (initial emphasis added)).  The Government further notes that The American Heritage Dictionary of the English Language, New Collegiate Edition (1976) similarly defines "beverage" as "[a]ny of various liquid *refreshments*, usually excluding water. . . . " (Emphasis added.)  *See* Def.'s Brief at 15.  Based on such authorities, the Government asserts that the definition of "beverage" "*implies a use* – that a good is used as a refreshing drink," and that heading 2202 is therefore a "use" provision (although no prior case has so held).  *See* Def.'s Brief at 15.[20]

Use provisions (other than actual use provisions) are governed by Additional U.S. Rule of Interpretation ("ARI") 1(a), which states that classification under such a provision is controlled by the principal use of the class or kind of merchandise described by the tariff heading at issue.  *See*

---

[19]An *eo nomine* tariff provision describes the articles classifiable thereunder by name.  In contrast, a use provision "classif[ies] particular merchandise according to the ordinary use of such merchandise," and "describ[es] articles in the manner in which they are used as opposed to by name."  <u>Primal Lite, Inc. v. United States</u>, 182 F.3d 1362, 1364 (Fed. Cir. 1999); <u>Len-Ron Mfg. Co. v. United States</u>, 334 F.3d 1304, 1308 (Fed. Cir. 2003).

[20]For its part, MaxCell blows hot and cold on the characterization of heading 2202 as a "use" provision.  At one point in its Reply Brief, MaxCell states that "[b]oth HTSUS 2106 and 2202 are use provisions."  *See* Pl.'s Reply Brief at 5.  But, just one page later, MaxCell asserts that "the <u>Carborundum</u> factors are not relevant to a tariff classification of MetaBerry and Aloe Gold."  *See id.* at 6 (*citing* <u>United States v. Carborundum Co.</u>, 63 C.C.P.A. 98, 102, 536 F.2d 373, 377 (1976)).  As the Government correctly points out, however, those two positions are inconsistent as a matter of fundamental logic.  *See* Def.'s Repy Brief at 6-8.  As explained herein, a use provision (other than an actual use provision) is governed by ARI 1(a), which, in turn, requires an analysis of the <u>Carborundum</u> factors.  *See id.*

ARI 1(a), HTSUS.  When applying a use provision, a court first ascertains the class or kind of goods

described by the heading, and then determines whether the merchandise at issue is a member of that

class or kind.  Application of the so-called "Carborundum factors" determines whether imported

merchandise falls within a particular class or kind of merchandise.  Those factors include: (1) the

general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers;

(3) the channels of trade in which the merchandise moves; (4) the environment of the sale (*e.g.*, the

manner in which the merchandise is advertised and displayed); (5) the use of the merchandise; (6)

the economic practicality of using the import in the same manner as the merchandise that defines

the class; and (7) the recognition in the trade of the use.  *See* United States v. Carborundum Co., 63

C.C.P.A. 98, 102, 536 F.2d 373, 377 (1976).

As the following analysis demonstrates, even assuming *arguendo* that heading 2202 of the

HTSUS is a use provision, MetaBerry and Aloe Gold cannot be classified there.

(1)   The General Physical Characteristics of the Merchandise.  As discussed above,

MetaBerry has a medicinal, bitter taste, and Aloe Gold has an oily appearance and the texture or

consistency of cod liver oil.  As the Government properly observes, those physical characteristics

are unlike those of most beverages, which are refreshing drinks with an appealing taste, often

designed to quench thirst.  *See* Def.'s Brief at 16-17; *see also*, *e.g.*, HQ 088377 (explaining that

heading 2202 has an "emphasis on soft drinks, such as cola, lemonade, nectars and purees with

added water and sugar," and "concern[s] products *primarily consumed for pleasure*, in unlimited

quantities"; classifying product as "beverage" under heading 2202, where it "is marketed as a

*refreshing* drink" and "the main purpose of [the] drink is . . . *to slake one's thirst* after arduous

activity") (emphases added).

(2) The Expectation of the Ultimate Purchasers. MaxCell candidly concedes that consumers expect that MetaBerry and Aloe Gold "will aid their health." *See* Pl.'s Reply Brief at 7. Both products are labeled as "anti-catabolics" and "dietary supplements."[21] And they are specifically marketed to appeal to consumers' interests in promoting their overall well-being. Based on its advertised properties, a consumer would expect MetaBerry to optimize oxygen and glucose delivery to the brain, protect the body from free radicals, enhance the immune system, and foster cardiovascular and urinary tract health. Similarly, based on its advertised properties, a consumer of Aloe Gold would expect it to slow the aging process by decreasing catabolic activity through increased antioxidant activity, by restoring the body's ideal pH, by restoring water balance in the colon, and by supporting the natural healing and renewing mechanisms of the gastrointestinal tract. As the Government notes, the expectations of the consumers of MaxCell's products are thus "far from the expectations of most beverage consumers who choose beverages for the products' taste,

---

[21]As noted above, MaxCell states that the FDA requires both MetaBerry and Aloe Gold to be marketed as "dietary supplements." To be sure, the labeling of a product as a dietary supplement is not determinative of its tariff classification. *See* Pl.'s Brief at 5-6 (*quoting* Inabata Specialty Chemicals v. United States, 29 CIT ____, ____, 366 F. Supp. 2d 1358, 1363-64 (2005) (citations omitted)); *see also* North Am. Processing Co., 236 F.3d at 698 (noting that "USDA regulations are not dispositive of whether a Customs classification ruling is correct); Nestle Refrigerated Food Co. v. United States, 18 CIT 661, 665-66 (1994) (collecting additional cases to similar effect). However, to say that FDA labeling requirements are not controlling is not to say that they are irrelevant. For example, labeling a product as a "dietary supplement" certainly has an effect on consumers' expectations of that merchandise.

Similarly, according to the declaration submitted by Customs' National Import Specialist responsible for dietary supplements, such products typically carry warnings concerning use by pregnant and nursing women. And, as the National Import Specialist responsible for beverages attested, nonalcoholic beverages generally do not.

[their] ability to refresh and [their ability to] quench a thirst." *See* Def.'s Brief at 17.

MaxCell emphasizes that consumers "will not eat" MetaBerry and Aloe Gold, and that neither product will "be substituted for a meal." *See* Pl.'s Reply Brief at 7. But MaxCell's protests are of no moment. As discussed above, the liquid state of MaxCell's products is not alone sufficient to justify their classification as "beverages" under heading 2202. Nor does the fact that the products are not nutritionally complete preclude their classification under heading 2106. *See, e.g.,* HQ 961909 (classifying under heading 2106 liquid vitamins "designed to *supplement* the nutritional needs of infants and small children") (emphasis added).

(3) <u>The Channels of Trade in Which the Merchandise Moves</u>. MaxCell sells MetaBerry and Aloe Gold in two ways – directly to consumers, through the website of Oasis LifeSciences, and also through sales agents called "independent Associates" who host "Ageless Living" events in their homes where the two products are promoted (along with other Oasis LifeSciences products) as part of a healthy and nutritious lifestyle. MaxCell seeks to make much of the fact that an internet search "using 'beverage' as a search term returned 75 products that could be purchased online." *See* Pl.'s Reply Brief at 7. However, that fact is meaningless absent evidence that those 75 products would properly be classified as "beverages" under heading 2202 – evidence that MaxCell does not offer. Further, MaxCell fails to address the fact that its products are not available through the usual retail outlets. As the Government observes, beverages are normally sold through retail stores such as grocery stores, convenience stores, club stores, and the like. *See* Def.'s Brief at 17-18. The channels of trade in which beverages and the merchandise at issue move are thus very different.

(4)  <u>The Environment of the Sale</u>.  The environment of sale also weighs heavily against MaxCell.  Most beverages are sold through displays on the beverage aisle at retail outlets such as grocery stores, convenience stores, and club stores.  *See generally* Def.'s Brief at 18.  But, as discussed above, MetaBerry and Aloe Gold are not even sold in retail stores.  Instead, the products are sold exclusively on the internet and through home parties hosted by individual sales agents.  MetaBerry and Aloe Gold thus are never sold side by side with typical beverages, and do not compete with them head-to-head.

MaxCell asserts that "[h]undreds of dietary supplements are offered for sale on various internet sites."  *See* Pl.'s Reply Brief at 7.  Maybe so – but that statement is of no relevance here absent proof that, *inter alia*, such supplements are classified as "beverages" under heading 2202.  MaxCell offers no such proof; nor does it appear that it could do so.

(5)  <u>The Use of the Merchandise</u>.  MaxCell contends that the portion size and taste of its products are irrelevant to their classification.  *See* Pl.'s Reply Brief at 7.  To the contrary, as the Government points out, "[m]ost beverages are consumed in substantial quantities such as 12 ounce cans, 16 ounce bottles, or quantities which fill standard glasses or cups."  *See* Def.'s Brief at 18.  But the  MetaBerry and Aloe Gold labels recommend a measured, one- to two-ounce dose, taken three times a day, before meals.[22]  Similarly, "[m]ost beverages are . . . consumed for refreshment and to

---

[22]According to the declaration submitted by the Customs National Import Specialist responsible for alcoholic and nonalcoholic beverages, most nonalcoholic beverages are promoted for consumption at virtually any time of the day, and certainly are not recommended for use only *prior to a meal*.  Nor are beverages typically sold with a cap that serves as a measuring cup, to measure small doses for consumption.  As the declaration submitted by the National Import Specialist responsible for dietary supplements explains, however, such supplements are often administered in small doses.

quench a thirst." *Id.* However, the bitter, medicinal taste of MetaBerry, and the oily appearance and

the texture or consistency of Aloe Gold, make the two products ill-suited for such purposes. As even

MaxCell concedes, consumers take MetaBerry and Aloe Gold to "aid their health." *See* Pl.'s Reply

Brief at 7.

(6)  The Economic Practicality of the Use of the Merchandise.  MaxCell accuses the

Government of improperly "trying to scale down the size of MetaBerry and Aloe Gold to a can of

coke." *See* Pl.'s Reply Brief at 7-8.  But the Government correctly observes that the economics of

MetaBerry and Aloe Gold are entirely different from those of common nonalcoholic beverages. *See*

Def.'s Brief at 19.  A 32-ounce container of MetaBerry costs $38.25, and a 32-ounce container of

Aloe Gold sells for $25.95.  Assuming – for the sake of comparison – that MetaBerry and Aloe Gold

were available in 12-ounce containers (a standard beverage container size), 12 ounces of MetaBerry

would cost almost $14.35, and 12 ounces of Aloe Gold would cost nearly $ 9.75. *See* Def.'s Brief

at 19.  As the Government concludes, "such prices . . . are many times higher than [those] of

virtually all nonalcoholic beverages." *Id.*

(7)  Recognition in the Trade.  Finally, there is no record evidence that the beverage industry,

the retail grocery industry, or any other relevant trade recognizes as "beverages" dietary supplements

like MetaBerry and Aloe Gold, which are neither flavorful nor refreshing, and which are taken in

very small, measured doses, and are recommended for use only before meals, "or as needed." *See*

Def.'s Brief at 19.

All of the Carborundum factors thus weigh against MaxCell.  Accordingly, assuming – for

purposes of this analysis – that heading 2202 is a use provision, MetaBerry and Aloe Gold are not

of the "class or kind" of "beverages" covered by heading 2202, and they cannot be classified thereunder. Nor are the two products classifiable under heading 2202 if it is treated as an *eo nomine* provision, for the reasons detailed above. Contrary to MaxCell's claims, MetaBerry and Aloe Gold are not classifiable as "beverages" under heading 2202, under any theory.

## B. HTSUS Heading 2106

The Government asserts that Customs properly classified MetaBerry and Aloe Gold under HTSUS heading 2106, which covers "[f]ood preparations not elsewhere specified or included." *See generally* Def.'s Brief at 20-23; Heading 2106, HTSUS.[23]

The tariff term "food preparation," as it is used in heading 2106, is not statutorily defined. However, the Explanatory Notes accompanying the heading provide specific guidance as to the meaning of the term, and make it clear beyond cavil that MetaBerry and Aloe Gold are properly classified there. *See* Def.'s Brief at 20-21; *see also*, *e.g.*, Warner-Lambert Co., 407 F.3d at 1210 (rejecting trial court interpretation which "discounts" Explanatory Notes; emphasizing that

---

[23]Just as it argues that heading 2202 is a "use" provision (*see* section III.A, *supra*), so too the Government asserts in its briefs that heading 2106 is a "use" provision (though, again, as with heading 2202, there is no indication that any authority has previously so held). *See* Def.'s Brief at 20; Def.'s Reply Brief at 1-2. However, the Government's briefs do not include a separate Carborundum analysis seeking to demonstrate that MetaBerry and Aloe Gold are within the "class or kind" of merchandise covered by heading 2106. *See id.*

In any event, as discussed below, the Explanatory Notes to heading 2106 make it abundantly clear that MetaBerry and Aloe Gold are classifiable under that heading, basically obviating the need for a Carborundum analysis. Nor is there any apparent need to here decide whether or not heading 2106 is a use provision, as the Government claims.

Explanatory Notes "expressly encompass" merchandise within heading).[24]

The Explanatory Notes to heading 2106 state that the products classifiable thereunder include:

> Preparations, often referred to as *food supplements*, based on *extracts from plants*, *fruit concentrates*, honey, fructose, etc. and containing added vitamins and sometimes minute quantities of iron compounds. These preparations are often *put up in packagings with indications that they maintain general health or well-being*. Similar preparations, however, intended for the prevention or treatment of diseases or ailments are excluded (heading 30.03 or 30.04).

*See* Explanatory Notes, Heading 2106, HTSUS (emphases added). The Explanatory Notes to heading 2106 thus describe MetaBerry and Aloe Gold to a "T."

According to the list of ingredients on the label, MetaBerry is a preparation based on a "Fruit Blend (concentrate)," as well plant and herbal extracts (including, *inter alia*, aloe vera and ginkgo biloba). Indeed, the label specifically promotes the product as "a unique combination of berry concentrates and botanicals." Similarly, the list of ingredients on Aloe Gold's label indicates that it is a preparation derived primarily from plant extracts (including, *inter alia*, aloe, pine needle extract, and green tea extract). Further, both MetaBerry and Aloe Gold are prominently labeled and marketed as "dietary supplements," emphasizing their benefits in maintaining general health and well-being.[25]

---

[24]As discussed in section III.A above, the Explanatory Notes provide a commentary on the scope of each heading of the HTSUS, and are the official interpretation of the Harmonized System at the international level. Although the Explanatory Notes are not binding (and thus are not dispositive), they are "generally indicative of proper interpretation of the [HTSUS]." *See generally* Mita Copystar, 21 F.3d at 1082; Warner-Lambert Co., 407 F.3d at 1209 (quotation omitted); H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.

[25]Neither MetaBerry nor Aloe Gold is marketed "for the prevention or treatment of diseases or ailments." *Compare* Explanatory Notes, Heading 2106, HTSUS (excluding from the scope of

Moreover, as the Government observes, Customs has consistently classified dietary supplements like MetaBerry and Aloe Gold under heading 2106.  *See* section III.A, *supra* (discussing, *inter alia*, HQ 084981, HQ 086744, and HQ 961909); Def.'s Brief at 22-23; Def.'s Reply Brief at 5-6.

In sum, because MetaBerry and Aloe Gold are "food supplements" based on "extracts from plants" and "fruit concentrates," among other things, and because the two products are "put up in packagings" and marketed to emphasize their asserted value in "maintain[ing] general health or well-being," both products are properly classified as "[f]ood preparations not elsewhere specified or included," under heading 2106 of the HTSUS.  *See* Explanatory Notes, Heading 2106, HTSUS.

Within heading 2106, Customs classified MetaBerry and Aloe Gold under subheading 2106.90.99, a residual (or "basket") provision covering "[f]ood preparations not elsewhere specified or included:  Other: Other: Other: Other: Other: Other."  *See* Subheading 2106.90.99, HTSUS.  Classification in a basket provision is appropriate when there is no subheading within the heading that more specifically covers the subject merchandise.  *See*, *e.g.*, Rollerblade, Inc. v. United States, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (citation omitted); Structural Indus., Inc. v. United States, 356 F.3d 1366, 1368 (Fed. Cir. 2004).

Here, there is no claim by MaxCell that some other subheading of heading 2106 more specifically describes MetaBerry and Aloe Gold.  A review of all subheadings under the heading indicates that, in fact, there is none.  Customs thus properly classified MetaBerry and Aloe Gold

---

heading 2106 "[s]imilar preparations . . . intended for the prevention or treatment of diseases or ailments").  Indeed, for example, the MetaBerry label is carefully worded, stating that it promotes "[h]ealthy cholesterol *in individuals with already normal levels*."  (Emphasis added.)

under subheading 2106.90.99 of the HTSUS.

C.  Skidmore Deference

The Government contends that Skidmore deference should be accorded Customs' ruling letters in this case – HQ 966849 (concerning MetaBerry), and HQ 966850 (concerning Aloe Gold). *See generally* Def.'s Brief at 7, 9-12; Def.'s Reply Brief at 4-6. *But see* Pl.'s Reply Brief at 1-2, 8-9 (arguing against Skidmore deference).

Customs' ruling letters are entitled to deference proportional to their power to persuade. United States v. Mead Corp., 533 U.S. 218, 235 (2001) (*citing* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  In evaluating the persuasiveness of a Customs classification ruling, the factors to be considered include "the writers' thoroughness, logic, and expertness, [the ruling's] fit with prior interpretations, and any other sources of weight."  Mead, 533 U.S. at 235.

As to the thoroughness and logic of the Headquarters ruling letters at issue here, it is worth noting that, although the rulings analyzed heading 2202 in some detail, Customs did not there characterize the heading as a "use" provision, as the Government now contends it is.  *See*, *e.g.*, Def.'s Brief at 15-16 (arguing that heading 2202 is a use provision).  Nor did the ruling letters state that heading 2106 is a "use" provision, as the Government here asserts. *See*, *e.g.*, Def.'s Reply Brief at 1-2 (asserting that heading 2106 is a use provision).  Unlike the Government's brief, neither of the ruling letters reflects a step-by-step analysis of the Carborundum factors as applied to the facts of this case.  *Compare* Def.'s Brief at 16-19 *with* HQ 966849 *and* HQ 966850.[26]

---

[26]As explained above, there is no need to here decide whether headings 2106 and 2202 are, in fact, use provisions.  *See* sections III.A & III.B, *supra*.

More importantly, in contrast to the ruling letters' analysis of heading 2202, the analysis of heading 2106 is essentially non-existent.  The analysis reads, in its entirety:  "Although the [Metaberry or Aloe Gold] is not a product of heading 2202, HTSUS, it is intended for human consumption.  Heading 2106, HTSUS, provides for food preparations not elsewhere specified or included. . . . [MetaBerry or Aloe Gold] is properly classified therein."  *See* HQ 966849; HQ 966850.  Significantly, the ruling letters make no reference whatsoever to the Explanatory Notes to heading 2106, on which the Government now hangs its hat.  *Compare* Def.'s Brief at 7, 20-21 (emphasizing the relevant Explanatory Note) *with* HQ 966849 and HQ 966850.

On the other hand, the third <u>Skidmore</u> factor – the agency's expertise – clearly weighs in favor of deference.  It is axiomatic that Customs has "specialized experience" in the classification of goods.  <u>Mead</u>, 533 U.S. at 534 (quotations omitted); *see generally* Def.'s Brief at 11 (noting that Congress delegated to Customs the authority to interpret the Tariff Act, and that Customs' determinations are presumed to be correct).  That factor weighs in favor of deference to every classification ruling, however, and therefore cannot be determinative.  But, in this case, it is complemented by the fourth <u>Skidmore</u> factor – the consistency of the ruling letters here with prior Customs' interpretations.

MaxCell charges broadly that "Customs has been inconsistent in its rulings on liquids and beverages."  However, MaxCell fails to identify any purported inconsistencies.  *See generally* Pl.'s Reply Brief at 1-2, 8-9.  The Headquarters ruling letters in this case cite three prior ruling letters, which classified various products under heading 2106 – HQ 084981 (involving "nutritional food preparations" containing honey and royal jelly, as well as plant- or animal-based extracts), HQ

086744 (involving a "nutritional health supplement" made of honey, royal jelly, and ginseng, as well as plant- or animal-based extracts), and HQ 961909 (involving children's liquid vitamins). Contrary to MaxCell's assertions, as discussed in section III.A above, the analysis set forth in those rulings is entirely consistent with that in HQ 966849 and HQ 966850, the ruling letters here. MaxCell identifies no other Customs rulings to document its claims of inconsistency.

Pointing to three judicial decisions, MaxCell intimates that, in the past, Customs has been overly expansive in its interpretation of tariff provisions covering "food preparations" and "edible preparations." *See* Pl.'s Reply Brief at 8-9 (*citing* Franklin v. United States, 289 F.3d 753 (Fed. Cir. 2002); Cosmos Int'l v. United States, 15 CIT 137, 760 F. Supp. 914 (1991); Strauss v. United States, 43 Cust. Ct. 136 (1959)). However, MaxCell's argument does nothing to undercut the fact that Customs has consistently classified dietary supplements under heading 2106, which is the basis for the Government's claim to Skidmore deference here. Nor do the three cases that MaxCell cites support its assertion that MetaBerry and Aloe Gold are classifiable under heading 2202.[27]

_____

[27]MaxCell's reliance on Franklin, Strauss, and Cosmos is ill-conceived for a number of reasons. In Franklin, the Court of Appeals held that Customs erred in classifying imported coral sand packets as a food preparation under HTSUS heading 2106. MaxCell argues that, like the coral sand packets in Franklin, "MetaBerry and Aloe Gold are not eaten and consumed as food and therefore, are not food preparations." *See* Pl.'s Reply Brief at 9. However, Franklin is distinguishable on its facts.

Among other things, unlike MetaBerry and Aloe Gold – which are consumed in their entirety – "the majority of the coral remains at the bottom of the glass while a small percentage goes into solution in order to change the chemical content of the water." Franklin, 289 F.3d at 760. More fundamentally, the court's decision in Franklin was predicated on its determination that the coral sand was used not as food but to purify water, and on the fact that the purification heading urged by the importer is more specific than the food preparation heading under which Customs had classified the coral sand. *Id*. at 761.

In Strauss, the court rejected Customs' classification of bubble gum under the TSUS

In any event, for the reasons detailed above, even absent deference to HQ 966849 and HQ 966850, Customs' classification of MetaBerry and Aloe Gold under subheading 2106.90.99 of the HTSUS is sustained.  *See* sections III.A & III.B, *supra*.  There is therefore no need to definitively determine whether those rulings would otherwise merit <u>Skidmore</u> deference.

---

provision covering edible preparations.  As a threshold matter, cases interpreting the TSUS are of somewhat limited value as precedent in classification cases under the HTSUS.  *See*, *e.g.*, <u>JVC</u>, 234 F.3d at 1354-55 (citations omitted).  And, more specifically, the bubble gum in <u>Strauss</u> was found not to be classifiable as a food preparation because – although sugars and syrup in the gum were swallowed as the gum was chewed – the bubble gum itself was a masticatory, and was not designed to be swallowed in its entirety, much like the coral sand at issue in <u>Franklin</u>, and unlike the MaxCell products at issue here.  <u>Strauss</u>, 43 Cust. Ct. at 140-41.

Finally, as MaxCell notes, the <u>Cosmos</u> court "rejected Customs attempts to classify . . . freezy pops as edible preparations holding they were properly classifiable as beverages."  *See* Pl.'s Reply Brief at 9.  Like <u>Strauss</u>, however, <u>Cosmos</u> too is a case under the TSUS, and is thus of relatively little precedential value.  Moreover, the freezer pops in <u>Cosmos</u> (which were consumed as they melted) were  not only liquid, but also specifically designed to be flavorful and refreshing – which MetaBerry and Aloe Gold plainly are not.  *See* <u>Cosmos</u>, 15 CIT at 145, 760 F. Supp. at 921 (finding that products at issue were "marketed for consumption by children as a treat").

In short, contrary to MaxCell's implications, none of the three cases that it cites supports its claim that MetaBerry and Aloe Gold are properly classified as beverages rather than the food preparations under the HTSUS.

## IV. <u>Conclusion</u>

As set forth above, MetaBerry and Aloe Gold were properly classified under subheading 2106.90.99 of the HTSUS.  Plaintiff's Motion for Summary Judgment is therefore denied, and Defendant's Cross-Motion is granted.

Judgment will enter accordingly.


                                                    _____
                                                       /s/ Delissa A. Ridgway
                                                        Delissa A. Ridgway
                                                               Judge



Decided:   December 18, 2007
               New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

MAXCELL BIOSCIENCE, INC.,                          :

                           *Plaintiff,*                          :

                         v.                          :        Court No. 04-00254

UNITED STATES,                          :

                       *Defendant.*                          :
_____

## **JUDGMENT**

This action having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

NOW, therefore, in conformity with said decision, it is

ORDERED that the last five counts of Plaintiff's Complaint – Counts II through VI (misnumbered Counts II through V) – be, and hereby are, dismissed with the consent of Plaintiff; and it is further

ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, denied; and it is further

ORDERED that Defendant's Cross-Motion for Summary Judgment be, and hereby is, granted; and it is further

ORDERED that the classification of the subject merchandise under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States is hereby sustained; and it is further

ORDERED, ADJUDGED, and DECREED that this action be, and hereby is, dismissed.


                                   /s/ Delissa A. Ridgway
                           _____
                                   Delissa A. Ridgway
                                       Judge

Dated:  December 18, 2007
        New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____    By: _____
                                                        Deputy Clerk